FRED W. JONES, Jr., Judge.
The State of Louisiana, through the Department of Health and Human Resources (“DHHR”), filed an action under La.R.S. 14:403 in the Monroe City Court, sitting as a juvenile court, alleging that RW, a five year old female, and KLW, a four year old male, were children in need of care as defined by Article 13(14)(a) of the Code of Juvenile Procedure (“CJP”).
Following a detention hearing, the juvenile judge removed the children from the home and custody of their mother, placed them in the legal custody of the DHHR, and gave their physical custody to the paternal grandparents pending further proceedings.
Later, after an extensive hearing, the juvenile court rendered judgment declaring the children to be in need of care; transferring their physical and legal custody to the father; ordering supervision by the DHHR for six months to coordinate visitation between the children and their mother; and directing that the children remain in professional counseling.
The mother appealed this judgment. For the reasons hereinafter explained, we affirm the judgment of the juvenile court.
A “child in need of care” is defined, in part, as one:
Whose parent inflicts, attempts to inflict, or, as a result of inadequate supervision, allows the infliction or attempted infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental or emotional health of the child. Article 13(14)(a), CJP.
If the petition requests that the child be adjudicated in need of care, the state must prove the allegations of the petition by a preponderance of evidence. Article 73, CJP.
When a child has been adjudicated to be in need of care, among other dispositions the court may place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child. Article 85, CJP.
Testifying on behalf of the state at the hearing in September 1985 were the father, stepmother, paternal grandmother, employees of DHHR, and various expert witnesses.
First, by way of background, it was established that the father and mother, both medical doctors, were divorced in May 1984. The mother was awarded the primary custody of the children. The father was granted extensive visitation rights, including having the children every other weekend, three two-week periods during the summer, and alternate holidays and birthdays.
The father testified that over a period of several months he noticed the children using sexually inappropriate language. On one occasion KLW suggested that the father remove his clothes so that the child could crawl over him in the nude. Another time RW shouted that KLW was showing his private parts. It was also during this span of time that KLW reportedly informed his father of playing “naked games” with his mother and sister at the mother’s home.
Asserting that this type of conduct was becoming both more frequent and alarming, the father took the children to see Mrs. *654 Meriwether, a pediatric social worker, who began therapy with the children on June 13,1985. More recent sessions occurred on August 14, 20, and 29, 1985. At their first session KLW spread apart the legs of a doll, which he identified as his mother, and indicated that he enjoyed sliding up and down against his mother when they got into her bed. Mrs. Meriwether reported that KLW appeared to be sexually overstimulated and that he knew too much for a child of his age about where to touch a female. KLW was consistent, throughout the interviews, in his descriptions of the “games” played with his mother and sister.
When questioned about sexual abuse, the female child told Mrs. Meriwether, “I don’t know.” The witness concluded that RW had been sexually abused by someone but related, “I just don’t know who did it.”
On June 19, 1985 the children were interviewed by two sheriff’s deputies. Because of the suggestive nature of the questions asked, the juvenile judge did not consider the information received as part of the evidence in the case.
The father also reported the possibility that the children had been sexually abused to Mrs. Pam Futch, a child protection investigator for the DHHR, on June 20, 1985, and she interviewed the youngsters on that date.
Mrs. Futch testified that KLW related how he and his mother played “touch” games which he demonstrated with anatomically-correct dolls, verbalizing that each touched the other’s private parts.
RW would not be interviewed alone, wept when questioned about sexual abuse, and stated that she would not tell anyone.
Believing that further investigation was warranted, Mrs. Futch arranged for the children to be examined by a medical doctor who, in turn, recommended that they be examined by Dr. O’Boyle, a pediatrician with experience in child sexual abuse cases.
Dr. O’Boyle saw both children on July 1, 1985 and saw RW a second time on July 22, 1985. KLW indicated that he played “naked games” with his mother. Using anatomically-correct dolls, he showed how they felt of each other’s private parts. Dr. O’Boyle testified that children do not conjure up these stories in their imaginations, but ordinarily learn sexual activity by watching other people or by having it done to them. She concluded that KLW had been greatly sexually stimulated — or abused.
On the other hand, RW again resisted examination. The child cried and said: “I’m not going to tell you.” Physical examination revealed that her hymen had been torn, but the tear had healed. Because of the location of the tear, Dr. O’Boyle concluded that sexual abuse had occurred.
Dr. Stephenson, a licensed psychologist, interviewed the children on June 26, 1985. Neither child reported incidents of sexual abuse to him. However, considering the mental and social age of KLW, this witness thought that the child’s consistent story for over two months should be believed.
The paternal grandmother, in whose home the children resided beginning the latter part of June 1985, told of walking into their bedroom and finding RW lying on top of KLW. When asked what they were doing, RW responded, “I’m going to marry my brother.”
The stepmother testified that over the two years she had known the children they frequently made inappropriate remarks concerning body parts.
Finally, Dr. Shwery, a clinical psychologist with expertise in sexual abuse cases, after reviewing information furnished him concerning the case, particularly with reference to the conversations with KLW, stated:
“I then concluded that there was sufficient veracity to lend credence to this youngster’s statement ... and I concluded that there was enough credibility there to believe that this child more likely than not had been sexually abused.”
The mother, testifying on behalf of herself, categorically denied ever having engaged in any kind of inappropriate sexual *655 behavior with her children. In addition she presented an impressive array of witnesses in her defense.
First, there were a number of lay witnesses, familiar with the children’s home and school situations, who testified they had never heard the children use language of a sexual nature or engage in sexual misconduct.
Several expert witnesses also testified in the mother’s behalf. Dr. Dyess, the children’s pediatrician since birth, never detected any signs of sexual abuse or molestation, but had not seen the children since August 1984.
Dr. Seiden, a psychiatrist, discussed emotional problems experienced by the mother whom he had treated, but found no connection between those problems and child abuse. Dr. Seiden stated that the mother “has good parenting abilities and I believe she could be a good primary parent.” He did not find the complex of symptoms usually associated with sexual abusers to be present in the mother and did not believe that she had abused the children. In fact, he had never known of a case of a person who was sexually abusing her children to bring those children in for therapy to find out why the children’s behavior had changed, as this mother did.
Dr. Mullen, another psychiatrist, examined the mother and found nothing that would impair her ability to function as an effective parent.
Dr. Mark Vigen, a clinical psychologist, said of the mother: “I find nothing wrong with her moral code. I think that she is an extremely good caretaker of her children.” Of the deputies’ interview with the children, Dr. Vigen remarked: “I think the children were enticed, somewhat manipulated, and maybe even bribed.” He gave no credence to the statements made by KLW.
Dr. Stockard, also a psychiatrist, evaluated the children over a period of several days in mid-July 1985. In a report admitted into evidence, she stated: “It is the opinion of this examiner that these two children have already been subjected to far too many double inquiries relevant to sexual abuse.” With reference to RW weeping near the end of an interview, Dr. Stockard commented: “This is significant to this examiner in that it is well-known and well-established in literature that little girls and little boys do become curious about each other and unbeknown to their adult authority figures tend to play sex games with each other.”
Todd-Thompson, psychiatric social worker, first saw the mother and children on December 14,1984, and saw the children on a regular basis until June 7, 1985. He testified that KLW never mentioned any sexual abuse by the mother or having played “naked games” with her. He added: “It would be unusual for a child to have never received any kind of inappropriate sexual stimulation.”
Dr. Goebel, clinical neuropsychologist, did not find that KLW was credible as a witness because “he contradicts what he says very readily and easily and he likes adult attention and he likes to please. He is easily engaged in fantasy as any four year old would be.” In conclusion, this witness did not believe that the mother had sexually abused her children but was competent as a parent.
Dr. Susan Vigen, specialist in school psychology with an emphasis upon working with children, interviewed RW and KLW. They both responded in the negative when asked whether they had ever played sex games, naked games or games without any clothes on. She found nothing inappropriate with teaching children correct anatomical terms, such as penis and vagina.
In written reasons for judgment, the juvenile judge concluded that KLW was credible because:
“The Court totally agrees with the theory that children of this age simply do not lie about sexual abuse and that it is beyond their frame-of-reference unless they are directly and overtly exposed to such matter.”
With reference to RW, the female child, the juvenile judge commented:
*656 “The physical evidence pertaining to [RW] was compelling and speaks for itself. The hymen was not intact and no evidence indicated that she would do it to herself or that she was victim of an accident or injury. Furthermore, the Court totally agrees with the theory that she has completely repressed the event.”
It is axiomatic that appellate courts accord great weight to the trial judge’s assessment of witness credibility and evaluation of testimony. In this case that process occurred on two levels. First, there was the credibility of those witnesses who reported what KLW allegedly said. We have no reason to question the juvenile judge’s acceptance of the veracity of that testimony. Second, and most important, is the question of the credibility of the male child, KLW. We note that his first statements concerning inappropriate sexual activity were made prior to the interview with the deputies. Third, there is the expert testimony that it is highly unlikely a four year old child could have given such a graphic account of sexual activity solely on the basis of a vivid imagination, even though that child is highly intelligent. Consequently, we find no abuse of discretion in the juvenile court’s determination that the state proved, not only by a preponderance of the evidence but by clear and convincing evidence, that these children had been the victims of sexually inappropriate behavior and were “children in need of care” as defined by the Louisiana Code of Juvenile Procedure.
For these reasons, we affirm the judgment of the lower court, at appellant’s cost.
MARVIN, J., dissents and assigns written reasons.